UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 03/31/2016

IN RE LIHUA INTERNATIONAL, INC.
SECURITIES LITIGATION

No. 14-CV-5037 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

On April 30, 2014, the website GeoInvesting.com published an article summarizing allegations that Lihua International, Inc. ("Lihua" or the "Company"), a copper manufacturing and distribution company based in China, faced a debt crisis and substantially (or entirely) shut down its production after its Chief Executive Officer, Zhu Jianhua, stole corporate inventory that had been pledged to creditors as collateral. The Company's stock price dropped by more than 50% and trading was halted on NASDAQ. Later that day, Lihua issued a press release acknowledging that its directors were "aware of a decline in the Company's stock price and published allegations that Mr. Zhu Jianhua, the Company's CEO and Chairman of the Company's Board, may have diverted or attempted to divert Company assets and as a result may have been the subject of action by local law enforcement." The press release also acknowledged that, "[i]f the allegations prove true, the Company's financial statements may contain material misstatements."

Litigation commenced the next day. In this action, Plaintiffs contend that the allegations against Zhu were true and that, from August 9, 2012 until the press release was issued, Lihua and its executives made false or misleading statements about the Company's finances, production activities, and internal controls in violation of §§ 10(b) and 20(a) of the Securities Exchange Act

of 1934 (the "Exchange Act"). Defendants Lihua, Daphne Yan Huang, Robert C. Bruce, Jonathan

P. Serbin, and Kelvin Lau (the "Represented Defendants") moved to dismiss Plaintiffs' Corrected

Second Amended Class Action Complaint (the "CSAC") for failure to plead with particularity that

some of the statements cited in the CSAC were false and for failure to allege scienter as to any

Defendant other than Zhu and his wife, Yaying Wang, who was Lihua's Chief Operating Officer

and a member of the Company's Board. For the reasons that follow, the motion is granted as to

Defendants Huang, Bruce, Serbin, and Lau. The motion is denied as to Lihua.

## BACKGROUND

### I.    Facts[1]

#### A.    The Parties

Lead Plaintiff James Holtz and Plaintiffs Peter Hoang and Beverly Burks are individuals

who allege they purchased Lihua stock "at artificially inflated prices" between August 9, 2012 and

April 30, 2014 (the "Class Period"). CSAC ¶¶ 1, 8–10.

Lihua is a Delaware corporation that manufactures and distributes refined copper products.

*Id.* ¶ 2. It is headquartered in Jiangsu Province, China, where it operates through two wholly

owned subsidiaries, Danyang Lihua Electron Co., Ltd. ("Lihua Electron") and Jiangsu Lihua

Copper Industry Co., Ltd. ("Lihua Copper"). *Id.* ¶¶ 11–12. During the Class Period, Lihua's stock

was traded on the NASDAQ exchange. *Id.* ¶ 11.

The individual defendants were all executives and/or directors of Lihua during the Class

Period. Zhu was Lihua's CEO and Chairman of the Board of Directors. *Id.* ¶ 13. He was also the

Executive Director and a member of the Boards of Lihua Electron and Lihua Copper. *Id.* Zhu's

---

[1] The facts are drawn from the CSAC and from certain documents submitted in support of the Represented
Defendants' motion, of which the Court may take judicial notice. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147,
153–54 (2d Cir. 2002).

wife, Wang, was Lihua's Chief Operating Officer and a member of Lihua's Board. *Id.* ¶ 15. She was also the Chief Operating Officer and a member of the Boards of Lihua Electron and Lihua Copper. *Id.* On May 6, 2014, both Zhu and Wang resigned their positions at Lihua, but not Lihua Electron or Lihua Copper. *Id.* ¶¶ 13, 15. After resigning, Zhu and Wang sold their Lihua stock, which amounted to 44% of the Company's outstanding shares. *Id.* ¶ 49.[2]

Huang was Lihua's Chief Financial Officer and Treasurer. *Id.* ¶ 14. From April 2003 until February 2009, Huang worked at GE Capital Markets, Inc. as an Assistant Vice President and then as Vice President of the Debt Capital Markets group. *Id.* Lihua hired her in October 2009 to be Executive Vice President of Finance and Director of Investor Relations. On October 23, 2011, she was promoted to CFO and Treasurer. *Id.* In March 2015 (after Plaintiffs filed the CSAC), Huang resigned from Lihua. *See* Defs.' Reply 7 n.8.

Bruce was a member of Lihua's Board and the Chairman of the Company's Audit Committee. CSAC ¶ 16. He resigned on June 27, 2014. *Id.*

Serbin and Lau were both members of Lihua's Board and also members of the Audit Committee. CSAC ¶¶ 17–18. They resigned on September 23, 2014. *Id.*

## B.    Lihua Prior to the Class Period

Plaintiffs allege that Lihua has a history, dating back at least to 2008, of "us[ing] bank loans to fund capital expenditures." CSAC ¶ 24. For example, Lihua "disclosed $6 million in bank debt as of December 31, 2008." *Id.* According to an individual hired by Lihua as a finance manager in December 2008 ("CI 1"), the "finance department was responsible for preparing and sending loan documents to the banks." *Id.* ¶ 25.

---

[2] Neither Zhu nor Wang have been served in this action, and the instant motion to dismiss was not filed on their behalf. On March 14, 2016, Plaintiffs informed the Court that the Chinese Ministry of Justice confirmed that it "received [P]laintiffs' request for service on Zhu and Wang under the Hague Convention and that the request is being processed." Dkt. 103, at 2.

3

Plaintiffs further allege that on March 27, 2009, Lihua obtained a loan from China Construction Bank in the amount of 10 million renminbi ("RMB"), or approximately $1.6 million. *Id.* ¶ 26. According to Plaintiffs, this loan "did not come due until March 26, 2012." *Id.* ¶ 28. Plaintiffs contend they discovered the existence of this loan in China's State Administration for Industry and Commerce ("SAIC") online database. *Id.* The Represented Defendants dispute that this transaction was a loan. They contend that the SAIC database instead makes clear that the transaction was actually a "line[] of credit secured by the pledge of moveable collateral." Defs.' Mem. 10; Beneski Decl. Ex. 35.

On May 13, 2009, Lihua "went public." CSAC ¶ 24. Plaintiffs allege that shortly thereafter, the Company retained Deloitte Touch Tohmatsu Ltd. ("Deloitte") as an "internal controls consultant." *Id.* ¶ 66. According to one of its press releases, Lihua retained Deloitte "to further align best practice corporate governance policies." Beneski Decl. Ex. 7, Ex. 99.1, at 1.

In October 2009, Lihua hired Huang to be the Executive Vice President of Corporate Finance. CSAC ¶ 24. An individual hired by Lihua Electron as a commercial manager in November 2009 ("CI 2") "confirmed that the finance department handled bank loans." *Id.* ¶ 25. Based on the SAIC database and the information provided by CI 1 and CI 2, Plaintiffs allege that "[t]hroughout Huang's tenure as Executive Vice President of Corporate Finance, [Lihua] continued to have outstanding bank loans on its books." *Id.* ¶ 27.

In 2010 and 2011, Lihua issued press releases indicating that it had retained two other firms to audit its finances and regulatory compliance. First, on March 9, 2011, Lihua issued a press release stating that in July 2010, it had appointed Crowe Horwath (HK) CPA Ltd. ("Crowe") to be the Company's "independent auditor." Beneski Decl. Ex. 8, Ex. 99.1, at 2. Second, on August 9, 2011, Lihua issued a press release stating that on July 18, 2011, it had retained John Lees

4

Associates ("JLA"), "a Hong Kong-based consulting firm specializing in forensic accounting and due diligence," to review the Company's cash balances. Beneski Decl. Ex. 10, Ex. 99.1, at 5. The press release also states that on August 4, 2011, Lihua "received independent verification" of its cash balances from JLA. *Id.*

On August 9, 2011, another outside firm, China 360° Solutions issued a Due Diligence Report about Lihua "on behalf of an unrelated third party." Beneski Decl. Ex. 12, at 1. The report concluded that Lihua "has done a better than average job of complying with its [Sarbanes-Oxley Act] requirements, as compared with other US-listed Chinese companies." *Id.* at 25.

On October 23, 2011, Huang was promoted and became Lihua's CFO and Treasurer. CSAC ¶ 14.

## C. Fraud During the Class Period

Plaintiffs allege that, throughout the Class Period, Lihua failed to disclose in securities filings that it "commit[ed] tax fraud," "took on massive debts," and saw its "production . . . collaps[e]." CSAC ¶¶ 28, 30–31.

### 1. Tax Fraud

Plaintiffs allege that from October 2012 to March 2013, Wang and Lihua Copper committed tax fraud by "issuing false VAT invoices." CSAC ¶ 30; Beneski Decl. Ex. 25, at 2.[3] According to Plaintiffs, "Lihua Copper had suppliers inflate invoices for raw materials and thus paid excessive prices for goods, reducing their VAT. Then the excess price Lihua paid was remitted back to a debit card controlled by Wang." CSAC ¶ 30. Wang and Lihua Copper were indicted by Chinese law enforcement for this activity. *Id.*; Beneski Decl. Ex. 25, at 2.

---

[3] The VAT, or value added tax, "is a sales tax that charges businesses the difference between what the seller paid for raw materials, and the price the seller received for a finished product." CSAC ¶ 30. Plaintiffs allege that "by exaggerating the amount that was paid for raw materials, a company can reduce its VAT charges." *Id.*

### 2. Debt

Plaintiffs allege that in 2012, "Lihua continued to borrow money and conceal its debt from shareholders." CSAC ¶ 29. Plaintiffs contend that, on October 24, 2012, Lihua obtained a second 10 million RMB loan from China Construction Bank. *Id.* As with the 2009 transaction with China Construction Bank, the Represented Defendants argue this transaction was not a loan but rather a line of credit. *See* Defs.' Mem. 10.

According to Plaintiffs, Lihua's undisclosed borrowing continued in 2013. On September 17, 2013, Lihua Copper obtained a 50 million RMB (approximately $8 million) loan from the Nanjing branch of Everbright, a Chinese bank. CSAC ¶ 38. Zhu, Wang, and Lihua Copper all guaranteed the loan, which was approved by Board resolutions from both Lihua Copper and Lihua Electron. *Id.* Plaintiffs allege that while the loan was not disclosed to Lihua shareholders, Zhu and Wang agreed to post 30 million RMB worth of Lihua's copper as collateral. *Id.*

Plaintiffs also allege that, around the time Lihua Copper obtained the Everbright loan, "Lihua's cash shortage began to drive its business decisions." *Id.* ¶ 33. An individual hired as a research and development director in July 2013 ("CI 3") "understood that [corporate] projects were being undertaken not just in the hopes of making a profit, but also as [a] way to justify to banks Lihua's requests for additional borrowings." *Id.* Relying on an article published on September 24, 2014 in the *Danyang Daily*, Plaintiffs contend that Lihua's debt "peaked at over $325 million . . . during the Class Period and by March 28, 2014 was over $195 million." *Id.* ¶ 28. Lihua's debt at the end of the Class Period was so outsized that it "threatened to cause a regional financial crisis in Lihua's hometown of Danyang City." *Id.*

6

### 3. Production

Plaintiffs also allege that "[b]y 2013, Lihua's production was collapsing." CSAC ¶ 31. Plaintiffs base this conclusion on descriptions of Lihua's operations in two Chinese news articles and a confidential informant who was hired by Lihua as a human resources assistant in February 2014 ("CI 4"). *Id.* ¶¶ 31–32, 39 & 41.

The first of the two news articles was published on March 28, 2014 in the *People's Daily*, which Plaintiffs allege is "the official newspaper of the government of China." *Id.* ¶ 32. According to an English translation of that article submitted by the Represented Defendants, a "long-time employee of Lihua Copper" indicated that Lihua "began to show signs of declining business at the end of 2012." Beneski Decl. Ex. 20, at 6. The article quotes the employee as saying, "[I]n the past when the company was operating normally, we could heat more than 270 furnaces per year, but [in 2013] we managed only to heat a little over 30 furnaces, and intermittently." *Id.* Plaintiffs allege this statement "impl[ies] that Lihua was operating at 11% of capacity in 2013." CSAC ¶ 32. The *People's Daily* article also quotes the Lihua employee as saying that the Company "basically stopped production after the Spring Festival" in 2014. Beneski Decl. Ex. 20, at 6. Plaintiffs allege that the Spring Festival ended on January 31, 2014. CSAC ¶ 39. The Represented Defendants argue the Spring Festival did not conclude until February 14, 2014, Defs.' Mem. 16–17 n.7, and that in any event they did not learn about the *People's Daily* article until it was summarized in English approximately one month later, *id.* at 5–6.

The second article on which Plaintiffs rely is the above-referenced *Danyang Daily* article published on September 24, 2014. CSAC ¶ 28. An English translation of this article submitted by the Represented Defendants states that "[o]nly 20% of the standard factory buildings, each

7

covering 150,000 square meters, were being utilized" and that "the majority of [Lihua's] plant area was empty." Beneski Decl. Ex. 26, at 5.

Plaintiffs contend that CI 4 corroborates the information published in the *People's Daily* and *Danyang Daily*. According to Plaintiffs, when CI 4 began working at Lihua in February 2014, "Lihua had stopped production, and employees were only engaged in equipment repair and a limited amount of smelting." CSAC ¶ 41. By March 2014, "CI 4 was told that [Lihua] would immediately begin dismissing workers." *Id.*

### D.   Discovery of the Fraud

Plaintiffs allege that in March 2014, Lihua lacked funds to make required payments on Lihua Copper's loan from Everbright. CSAC ¶ 42. Rather than "admit that Lihua was bankrupt," Zhu "asked 10 employees, including CI 3, to participate in transporting scrap copper" that had been pledged as collateral "to a rented warehouse." *Id.* ¶¶ 42–43. Because an Everbright "bank supervisor was onsite at Lihua's facilities to oversee the storage of the copper," Zhu's associates "got the supervisor drunk, and then moved the inventory." *Id.* ¶ 43. That day, CI 3 also saw Zhu and Wang "burning documents in the offices and deleting 'all files from company computers.'" *Id.* ¶ 44. Everbright reported the incident to Chinese police and sued Lihua Copper. *Id.* ¶¶ 38, 45.

On March 28, 2014, the *People's Daily* published its article, describing both the criminal investigation against Zhu and Lihua's rising debt and declining production. *Id.* ¶ 45; Beneski Decl. Ex. 20. The *People's Daily* article was published only in Mandarin. CSAC ¶ 129.

On April 30, 2014, the website GeoInvesting.com published a summary of the *People's Daily* article in English. *Id.* ¶ 130. That morning, Lihua's stock—which was traded in the United States on the NASDAQ—dropped by more than 50%, from $4.33 per share to $2.08 per share. *Id.* ¶ 131. At 11:08 a.m., the NASDAQ halted trading on Lihua's stock. *Id.*

8

At 2:40 p.m. the same day, Lihua issued a press release stating:

> The Board of Directors of Lihua . . . is aware of a decline in the Company's stock price and published allegations that Mr. Zhu Jianhua, the Company's CEO and Chairman of the Company's Board, may have diverted or attempted to divert Company assets and as a result may have been the subject of action by local law enforcement. Although they have not yet been able to verify this information, the Board's Audit Committee is taking steps to determine the facts and will take appropriate action. If the allegations prove true, the Company's financial statements may contain material misstatements.

*Id.* ¶ 47; Beneski Decl. Ex. 22, Ex. 99.1, at 1.

On May 4, 2014, Zhu and Wang submitted letters of resignation to Lihua's Board. CSAC ¶ 48; Beneski Decl. Ex. 5. On May 6, 2014, Lihua received the letters and announced Zhu's and Wang's resignations, noting that they "were due to personal reasons." Beneski Decl. Ex. 5.

Lihua disclosed in a Form 8-K dated September 29, 2014 that during this time, Huang and the Audit Committee "made numerous efforts to obtain information related to the allegations, including through calls to staff at [Lihua], calls to [Lihua's] former [Chinese] local counsel, and numerous attempts to communicate via phone with" Zhu and Wang. Beneski Decl. Ex. 21, at 1. Huang and the Audit Committee were also "in contact with" Crowe. *Id.* On May 7, 2014, the Audit Committee engaged the law firm McDermott Will & Emery to investigate the allegations against Zhu and Wang. *Id.* However, Lihua ultimately "had limited access to cash and could not continue to fund the work." *Id.* On May 12, 2014, Huang and the Audit Committee traveled to China "to visit the facilities of Lihua's subsidiaries . . . and to meet with local government officials and bank managers." *Id.*

On May 14, 2014, Zhu and Wang sold their 44% interest in Lihua's stock to an entity indirectly owned by two state-owned Chinese companies, Wuxi Industry Development Group Co., Ltd. and Jiangsu Huihong International Group. CSAC ¶ 49. According to Lihua's September 29,

2014 Form 8-K, Huang and the Audit Committee also met with Wuxi representatives while in China. Beneski Decl. Ex. 21, at 1. On June 10, 2014, Lihua's Board appointed two new members to the Board, both of whom held positions at Wuxi or its related entities. CSAC ¶ 52. One of the new Board members was also appointed as Lihua's new CEO. *Id.*

On June 26, 2014, the NASDAQ delisted Lihua. *Id.* ¶ 132. Lihua's stock fell to $0.30 per share on the over-the-counter market. *Id.*

On June 27, 2014, Bruce resigned from Lihua's Board and Audit Committee. *Id.* ¶ 53. In his resignation letter, Bruce explained that there was "a substantial disagreement between [him] and [Lihua] regarding the appropriate action of the Company with respect to an independent investigation" into Zhu's conduct and subsequent sale of his 44% interest in Lihua's stock. Beneski Decl. Ex. 23, Ex. 17.1, at 1. In Bruce's opinion, "funding and otherwise supporting the [i]nvestigation should have been . . . the highest priority for [Lihua]." *Id.*

In July 2014, "Lihua's management had regained control of Lihua's offices," but were "locked out of Lihua's company emails, which were hosted by a third party." CSAC ¶ 54. Plaintiffs allege that "someone with an administrative login deleted those emails from a computer located in Danyang City." *Id.*

On July 25, 2014, Lihua retained Asia Pacific CPA Group, a China-based accounting firm, to investigate and report on the financial condition of Lihua's subsidiaries as of June 30, 2014. CSAC ¶ 56; Beneski Decl. Ex. 9, at 1. To fund the investigation, Lihua obtained a loan from the entity that had purchased Zhu's and Wang's 44% interest in the Company. Beneski Decl. Ex. 21, at 2.

While Asia Pacific investigated Lihua Copper's and Lihua Electron's finances, Lihua's Board concluded that some of the financial statements Lihua had issued may be inaccurate. On

August 29, 2014, Lihua issued a Form 8-K disclosing: (1) that "during 2013, and between January 1, 2014 and April 30, 2014, [Lihua's] subsidiaries entered into certain letters of credit and other short-term borrowing transactions that were not authorized by the Board" and that these letters of credit and transactions were neither "reflected in the financial statements included in" Lihua's filings with the Securities and Exchange Commission ("SEC") nor disclosed to Huang, the Audit Committee, or Crowe; (2) that on August 26, 2014, Lihua's Board concluded that the Company's 2013 financial statements contained in Lihua's quarterly reports on Form 10-Q and its annual report on Form 10-K "should no longer be relied upon"; (3) that on August 27, 2014, Lihua notified Crowe of the Board's conclusion; and (4) that on August 28, 2014, Crowe resigned as Lihua's independent auditor. Beneski Decl. Ex. 9, at 1. The August 29 Form 8-K also disclosed that Lihua was "unable to locate certain of the books and records of its subsidiaries, and therefore [Lihua] can provide no assurance that it would be in a position to restate the financial statements . . . on a timely basis, if at all." *Id.*

On September 9, 2014, Asia Pacific completed its investigation. Beneski Decl. Ex. 21, at 2. In its September 29, 2014 Form 8-K, Lihua disclosed that Asia Pacific determined that although Lihua Copper's and Lihua Electron's "internal ledger balances" showed combined assets that exceeded liabilities, the subsidiaries' actual assets were significantly smaller and their actual liabilities were significantly larger. *Id.* Asia Pacific also determined that the subsidiaries had borrowed money from ten different banks in an aggregated amount of more than 1 billion RMB, that 333.1 million RMB in receivables due to Lihua Copper had been transferred to an entity believed to be related to Zhu, and that a different entity related to Zhu owed Lihua Copper 350.5 million RMB. *Id.* at 2–3. The Form 8-K indicates that none of the transactions described in Asia Pacific's report were disclosed to Huang, Lihua's Board, or Crowe. *Id.* at 3.

Plaintiffs allege that the September 29, 2014 Form 8-K "reveals that the bulk of Lihua's liabilities were apparent from the face of Lihua's books and records." CSAC ¶ 60. The Form 8-K notes, however, that Asia Pacific reached its conclusions by "verif[ying] and analy[zing] . . . detailed year-to-date June 30, 2014 profit and loss, and balance sheet items as of June 30, 2014" and by "verif[ying] and investigati[ng] . . . material balance sheet items including inventory, accounts receivable, prepayment, other receivables, fixed assets, bank liabilities and other liabilities." Beneski Decl. Ex. 21, at 2.

On September 23, 2014, Serbin and Lau resigned from Lihua's Board. *Id.* at 1. Neither "expressed any disagreement with the Company on any matter relating to the Company's operations, policies or practices." *Id.*

Lihua has thus far taken no legal action against Zhu or Wang. CSAC ¶¶ 63, 139.

## II.     Procedural History

The first securities fraud action related to Zhu's misconduct while CEO of Lihua was initiated in the Central District of California the day after GeoInvesting.com published its article and Lihua's stock price dropped. Dkt. 1. A second lawsuit was also filed in the Central District of California, and all parties stipulated to transfer both suits to the Southern District of New York, where Huang is located and where Lihua's stock was traded on the NASDAQ. *See* Dkt. 9. This Court consolidated the two actions, appointed Holtz as lead Plaintiff, and approved Holtz's counsel to represent Plaintiffs' class. Dkt. 42.

Plaintiffs subsequently filed a First Amended Class Action Complaint and a Corrected First Amended Class Action Complaint. Dkt. 61, 64. The Represented Defendants moved to dismiss. Dkt. 67. In response, Plaintiffs filed a Second Amended Class Action Complaint and then the

CSAC. Dkt. 74, 77. The Represented Defendants again moved to dismiss. Dkt. 80. After the motion was fully briefed, the Court heard oral argument. Dkt. 104.

## LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In making this determination, courts must accept as true the facts in a complaint and may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Securities fraud claims must also satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting" the fraud. Fed. R. Civ. P. 9(b). In other words, "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). The PSLRA expands

on Rule 9(b) and requires "that 'securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal quotations omitted)).

## DISCUSSION

Plaintiffs bring two claims under the Exchange Act.  First, they allege that Zhu, Huang, and Lihua violated § 10(b) and Rule 10b–5 promulgated thereunder because they made false or misleading statements about Lihua's debt, production, and corporate governance.   CSAC ¶¶ 151–62.  Second, Plaintiffs allege that Zhu, Wang, Huang, Bruce, Serbin, and Lau are jointly and severally liable pursuant to § 20(a) of the Exchange Act because they controlled the § 10(b) violators.  *Id.* ¶¶ 163–68.  The Court will consider each claim in turn.

## I.    Section 10(b) and Rule 10b–5

To state a claim under § 10(b) and Rule 10b–5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  The Represented Defendants challenge only the first two elements, so the Court need address only those.

### A.    Material Misrepresentations or Omissions

As noted above, the PSLRA requires that Plaintiffs specifically identify each statement they allege contains material misrepresentations or omissions and "set forth the facts on which

[their] belief that a statement is misleading was formed." *Anschutz Corp.*, 690 F.3d at 108 (quoting *Dura Pharms.*, 544 U.S. at 345). Plaintiffs ultimately "must do more than say that the statements . . . [are] false and misleading; they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.

Plaintiffs identify seven of Lihua's SEC filings from 2012 and 2013 that they allege contain false statements and three 2013 conference calls during which Plaintiffs allege Huang misled analysts. CSAC ¶¶ 72–128.[4] The Represented Defendants acknowledge that Plaintiffs have adequately pled that one statement in Lihua's 2013 Form 10-K is false, but argue that all of Plaintiffs' other allegations fail. *See* Defs.' Mem. 10–17. With the exception of Lihua's Sarbanes-Oxley Act certifications filed with the Company's 2012 Second Quarter Form 10-Q, 2012 Third Quarter Form 10-Q, and 2013 Form 10-K, the Court concludes that Plaintiffs have adequately alleged that Lihua's SEC filings contain material misstatements or omissions.

### 1.    Lihua's 2012 Second Quarter Form 10-Q

Lihua filed its 2012 Second Quarter Form 10-Q on August 9, 2012. CSAC ¶ 72. Plaintiffs allege the 2012 Second Quarter 10-Q contains two false statements, while the Represented Defendants argue it contains none. *Compare id.* ¶¶ 74–77, *with* Defs.' Mem. 11–12. The Court agrees with Plaintiffs as to one of the statements at issue and with the Represented Defendants as to the other.

---

[4] In conjunction with the filing of Lihua's 2013 First and Second Quarter Form 10-Qs and 2013 Form 10-K, Huang held conference calls on May 10, 2013, August 9, 2013, and March 17, 2014 to answer analysts' questions about the company. CSAC ¶¶ 99, 109 & 127. Plaintiffs allege that Huang made misleading statements during the May 10, 2013 call regarding the Audit Committee's role at Lihua and during the August 9, 2013 and March 17, 2014 calls regarding Lihua's cash balances. *Id.* ¶¶ 100, 110 & 128. The Represented Defendants argue that none of Huang's statements were false. *See* Defs.' Mem. 15–16. The Court need not resolve this dispute, however, in light of its conclusion below that the CSAC fails to allege scienter as to Huang.

### a.     Debt

Plaintiffs allege that the 2012 Second Quarter 10-Q falsely "reported no outstanding debt for the period, and no debt as of December 31, 2011, except for small loans from Zhu and an entity controlled by Zhu that were repaid by March 31." CSAC ¶ 74.  According to Plaintiffs, this statement is false because it "failed to disclose that as of December 31, 2011[, Lihua] had an outstanding loan of 10 [m]illion RMB with China Construction Bank." *Id.* ¶ 75.[5]  The Represented Defendants argue that Lihua's two transactions with China Construction Bank "were not actually loans" and were instead "two successive lines of credit secured by the pledge of moveable collateral." Defs.' Mem. 9–10.  The Represented Defendants thus contend that the CSAC fails to allege facts supporting Plaintiffs' allegation that Lihua's 2012 Second Quarter 10-Q misrepresented the Company's actual outstanding debt. *See id.* at 11–12.

On the record currently before it, the Court cannot determine whether Lihua's transactions with China Construction Bank were loans or merely lines of credit.  The CSAC alleges the 2009 transaction was "a loan." CSAC ¶ 26.  At this early stage of litigation, the Court must accept this allegation as true "unless conclusory or contradicted by more specific allegations or documentary evidence." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 n.1 (2d Cir. 2012).  The Represented Defendants rely on documentary evidence—namely, the SAIC's online database—but that evidence is in Mandarin and the parties dispute the proper English translation.[6]  The language of Plaintiffs' translation—which describes the 10 million RMB as an

---

[5] Plaintiffs allege that Lihua's 2009 transaction with China Construction Bank was a loan that "did not come due until March 26, 2012." CSAC ¶ 28.

[6] The Represented Defendants translate the same set of characters as both "Right to Debt Ownership Amount" and "Amount of Secured Debt." Beneski Decl. Ex. 35(b), at 1, 2.  Plaintiffs argue that the characters should be translated as "amount of secured creditors' rights." Chen Decl. ¶ 6.  The Represented Defendants concede that, "given the inherent subjectivity involved in translating Chinese to English," Plaintiffs' translation is "acceptable." Defs.' Request for Judicial Notice Reply 9.  For the purpose of resolving the Represented Defendants' motion, the Court will therefore assume for the purposes of this motion that the SAIC database describes the 10 million RMB as an "amount of secured creditors' rights."

16

"amount of secured creditors' rights"—could refer either to a loan (and the amount of money that a creditor has the right to collect) or a line of credit (and the amount of collateral to which a creditor may, at some point, be entitled). Assuming Plaintiffs' translation is accurate, the SAIC database therefore does not directly contradict Plaintiffs' allegations. The CSAC accordingly controls, and Plaintiffs have adequately pled that Lihua's 2012 Second Quarter 10-Q misrepresented the Company's debt. *See Mackley v. Sullivan & Liapakis, P.C.*, No. 98-CV-4860 (SWK), 1999 WL 287362, at *3 n.2 (S.D.N.Y. May 7, 1999) ("Because the documents incorporated by reference and attached to the complaint do not contradict, but merely cast doubt on some of [plaintiff's] allegations, the Court must accept those allegations as true.").

### b.    Sarbanes-Oxley Certification

Plaintiffs also allege that the 2012 Second Quarter 10-Q contains false information in the certification filed pursuant to the Sarbanes-Oxley Act. In the certification, Zhu and Huang affirmed that they were "responsible for establishing and maintaining disclosure controls and procedures," and that they "[d]esigned such disclosure controls and procedures, or caused such disclosure control and procedures to be designed under [their] supervision, to ensure that material information relating to [Lihua], including its consolidated subsidiaries, is made known to us by others within those entities." CSAC ¶ 76. Plaintiffs allege this certification is false because the "internal controls failed to properly identify" the outstanding loan from China Construction Bank and Lihua thereby "failed to disclose material weaknesses in its internal control." *Id.* ¶ 77. The Represented Defendants argue this allegation fails as a matter of law because the CSAC "allege[s] no facts about what controls Lihua employed or how they were inadequate." Defs.' Mem. 12.

The Court agrees with the Represented Defendants. When a plaintiff "fail[s] to cite any contemporaneous support to show that . . . procedures were not followed," subsequent events do

17

not establish that a defendant "failed to follow its internal control procedures." *In re Royal Bank of Scotland Grp. plc Sec. Litig.*, No. 09-CV-300 (DAB), 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012), *aff'd sub nom. Freeman Grp. v. Royal Bank of Scotland Grp. PLC*, 540 F. App'x 33 (2d Cir. 2013); *see also C.D.T.S. v. UBS AG*, No. 12-CV-4924 (KBF), 2013 WL 6576031, at *3–4 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015).

Plaintiffs here allege no facts about what Lihua's internal controls were or whether they were followed. Instead, Plaintiffs ask the Court to infer that the controls were inadequate because they failed to identify the alleged China Construction Bank loan and ensure that it was disclosed in the 2012 Second Quarter 10-Q. Such allegations are insufficient to allege falsity under the PSLRA. *See In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 358–59 (S.D.N.Y. 2015) (dismissing claims when plaintiffs failed to "make any allegation as to how or why [the company's] internal controls were inadequate"), *aff'd sub nom. Klein v. PetroChina Co. Ltd.*, ___ F. App'x ____, 2016 WL 1085786 (2d Cir. Mar. 21, 2016). Plaintiffs therefore may not pursue a securities fraud claim based on the Sarbanes-Oxley certification in Lihua's 2012 Second Quarter 10-Q.

### 2.    Lihua's 2012 Third Quarter Form 10-Q

Lihua filed its 2012 Third Quarter Form 10-Q on November 9, 2012. CSAC ¶ 78. Plaintiffs allege the 2012 Third Quarter 10-Q contains false statements in exactly the same two ways they allege the 2012 Second Quarter 10-Q is false. *Id.* ¶¶ 80–83. For the reasons stated above, the Court therefore concludes the CSAC adequately alleges that the 2012 Third Quarter 10-Q mischaracterizes Lihua's outstanding debt, but fails to allege that Lihua's Sarbanes-Oxley certification is false or misleading.

### 3.  Lihua's 2012 Form 10-K

Lihua filed its 2012 Form 10-K on March 18, 2013.  CSAC ¶ 84.  Plaintiffs make the same allegations with regard to the 2012 10-K as they do with the 2012 Second Quarter 10-Q and 2012 Third Quarter 10-Q, with one addition.   In alleging that the 2012 10-K's Sarbanes-Oxley certification contains false statements, Plaintiffs rely not only on Lihua's failure to report the alleged loans from China Construction Bank, but also on Lihua's failure to report "the tax fraud committed by Lihua Copper and Defendant Wang."  *Id.* ¶ 90.  Plaintiffs contend this additional allegation provides an independent ground to conclude that the 2012 10-K's Sarbanes-Oxley certification contains false statements.  *See* Pls.' Mem. 10.

The Court agrees.  The certification affirms that Zhu and Huang "disclosed . . . to [Lihua's] auditors and the [A]udit [C]ommittee . . . any fraud, whether or not material, that involves management or other employees who have a significant role in [Lihua's] internal control over financial reporting."  CSAC ¶ 89.  Unlike the certification statement analyzed above—in which Zhu and Huang affirmed that they designed a control system—this statement describes an affirmative obligation to disclose "any fraud."   Plaintiffs allege that Wang and Lihua Copper committed tax fraud from October 2012 to March 2013 and that this fraud was not disclosed to Crowe or the Audit Committee during the time period covered by the 2012 10-K.  CSAC ¶¶ 30, 90.  Plaintiffs accordingly allege that the 2012 10-K Sarbanes-Oxley certification is false.[7]

---

[7] The Represented Defendants do not appear to dispute that the CSAC sufficiently alleges that Zhu and Huang did not disclose Wang and Lihua Copper's fraud to Lihua's auditors or the Audit Committee.  They argue instead only that this theory of falsity is "not in the Complaint." Defs.' Rep. 1 n.2. The CSAC directly asserts this theory, however, with regard to Lihua's 2012 10-K, 2013 First Quarter Form 10-Q, 2013 Second Quarter Form 10-Q, and 2013 Third Quarter 10-Q.  CSAC ¶¶ 90, 98, 108 & 118.

The Court therefore concludes that the CSAC adequately alleges that the 2012 10-K mischaracterizes Lihua's outstanding debt and that Lihua's Sarbanes-Oxley certification was materially misleading.

### 4. Lihua's 2013 First Quarter Form 10-Q

Lihua filed its 2013 First Quarter Form 10-Q on May 10, 2013. CSAC ¶ 91. Plaintiffs argue they have adequately alleged that the 2013 First Quarter 10-Q contains three false statements, and the Court agrees.

#### a. Debt

Plaintiffs allege the 2013 First Quarter 10-Q falsely "recorded no debt" for the time period of January 1, 2013 to March 31, 2013. CSAC ¶ 93. Plaintiffs contend this statement is false because "Lihua failed to disclose debt that it took on throughout 2013, which eventually led upwards of $300 million in debt, and included an outstanding loan of 10 million RMB owed to China Construction Bank." *Id.* ¶ 94. For the reasons discussed above, Plaintiffs have adequately pled that Lihua had debt it did not report at least as to the alleged loan from China Construction Bank.

Even if this were insufficient, however, Plaintiffs also allege that "Lihua failed to disclose debt that it took on throughout 2013." *Id.* The Represented Defendants argue that although Plaintiffs allege that Lihua took on significant debt at some point during 2013, the CSAC does not provide sufficient details to determine whether any of that debt existed specifically during the time period covered by the 2013 First Quarter 10-Q. *See* Defs.' Mem. 13. Lihua's August 29, 2014 Form 8-K disclosed, however, that Lihua's Board determined that as a result of the unauthorized loans obtained by Lihua's subsidiaries "during 2013," Lihua's "financial statements for the quarters ended [*sic*] March 31, 2013, June 30, 2013, and September 30, 2013, included in the

Company's Quarterly Reports on Form 10-Q for such periods should no longer be relied upon." Beneski Decl. Ex. 9, at 1. Because Lihua itself acknowledges that the financial information in its 2013 First Quarter 10-Q is unreliable, Plaintiffs have adequately pled its falsity.

### b.    Production

Plaintiffs also allege the 2013 First Quarter 10-Q falsely reported "a copper refinery capacity of 125,000-140,000 tonnes per annum, and sales of 10,179 tons of CCA and copper wire, 14,473 tons of copper anode, and 2,177 tons of copper rod, a 32 percent increase in volume over the same quarter the previous year." CSAC ¶ 95. Plaintiffs contend these statements are false because "Lihua failed to disclose that Lihua's production was declining in 2013, and that throughout the Class Period it was operating at 20% of capacity or lower and below 11% throughout 2013." *Id.* ¶ 96. To support these conclusions, Plaintiffs rely on the articles published in the *People's Daily* and *Danyang Daily.* The March 28, 2014 *People's Daily* article quotes a "long-time employee of Lihua Copper," who said that Lihua "began to show signs of declining business at the end of 2012" and that in 2013, Lihua "managed only to heat a little over 30 furnaces, and intermittently," whereas "in the past . . . we could heat more than 270 furnaces per year." Beneski Decl. Ex. 20, at 6. The article also quotes the employee saying that Lihua "basically stopped production after the Spring Festival" in 2014, which Plaintiffs allege occurred on January 31, 2014. *Id.*; CSAC ¶ 29. The September 24, 2014 *Danyang Daily* articles adds that "[o]nly 20% of the standard factory buildings, each covering 150,000 square meters, were being utilized" and that "the majority of [Lihua's] plant area was empty." Beneski Decl. Ex. 26, at 5. The article attributes these facts to an identified source outside Lihua who "uncovered the reasons for Lihua's failure." *Id.*

21

The Represented Defendants argue that the two articles do not support the conclusions that Plaintiffs draw, and that Plaintiffs do not otherwise plead facts that show Lihua's production declined between January 1, 2013 and March 31, 2013. *See* Defs.' Mem. 13–14. For example, the Represented Defendants criticize the *People's Daily* article for relying on an anonymous source and for making claims about Lihua's production capacity that are "nonsensical." *Id.* at 14. The Represented Defendants also argue that the *Danyang Daily* article said only that, at some unspecified time, Lihua used 20% of its factory buildings, not that the Company was "operating at 20% of capacity or lower . . . throughout 2013." *Compare* Beneski Decl. Ex. 26, at 5, *with* CSAC ¶ 96. To refute the accuracy of both articles, the Represented Defendants point to other statements in Lihua's SEC filings describing the Company's production levels and capacity. *See* Defs.' Mem. 13–14.

Although the record currently before the Court is insufficient to resolve the parties' factual disputes regarding Lihua's production capacity and operations during the time period covered by the 2013 First Quarter 10-Q, Plaintiffs have alleged sufficient facts to meet their heightened pleading obligation at this stage. Both the *People's Daily* and *Danyang Daily* articles describe specific ways in which Lihua's production allegedly decreased, and they indicate that the decline occurred in the first quarter of 2013.[8] The *People's Daily* article said that Lihua "began to show

---

[8] The Represented Defendants argue that the employee quoted in the *People's Daily* article is unreliable because "the article gives no information [about him], much less facts to support the probability that he 'would possess the information alleged.'" Defs.' Mem. 14 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). In *Novak*, however, the Second Circuit held only that plaintiffs in securities fraud cases need not name their confidential sources "as long as they supply sufficient specific facts to support their allegations." 216 F.3d at 314. It is true that nothing in *Novak* suggests that its standard applies to confidential sources quoted in publically available news articles. At least one judge in this district has nonetheless concluded that "articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (internal quotation omitted). To the extent, therefore, the *People's Daily* article must provide information to support the reliability of its source and the information attributed to him in order for Plaintiffs to rely on it, the Court concludes the article satisfies this burden. The article notes that its source was a "long-time employee of Lihua Copper" who experienced "a great loss of income" as a result of Lihua's alleged decline in production beginning at the end of 2012. Beneski Decl. Ex. 20, at 6. Because the employee appears to have worked only when Lihua's production schedule required it, there is a sufficient

signs of declining business at the end of 2012," suggesting that the decline in production described by the employee had begun by the first quarter of 2013. Beneski Decl. Ex. 20, at 6. The *Danyang Daily* article stated that Lihua's decline in production was one of "the reasons for Lihua's failure." Beneski Decl. Ex. 26, at 5. Lihua's downfall occurred throughout 2013, including during the year's first quarter. Plaintiffs have therefore adequately alleged that the statements related to Lihua's production level and capacity in the 2013 First Quarter 10-Q contain material misrepresentations.

### c. Sarbanes-Oxley Certification

Plaintiffs lastly allege the Sarbanes-Oxley certification signed by Zhu and Huang is false in light of Lihua's "failure to report a loan for 10 [million] RMB that was outstanding during the reporting period, and the tax fraud committed by Lihua Copper and Defendant Wang." CSAC ¶ 98. As discussed above, Plaintiffs have adequately alleged the falsity of the certification in light of Wang and Lihua Copper's purported tax fraud, but not with regard to the alleged weaknesses in Lihua's internal controls.

### 5. Lihua's 2013 Second Quarter Form 10-Q

Lihua filed its 2013 Second Quarter Form 10-Q on August 9, 2013. CSAC ¶ 101. Plaintiffs' allegations regarding the 2013 Second Quarter 10-Q are almost identical to their allegations related to the 2013 First Quarter 10-Q, and they adequately allege falsity for the same reasons. *See id.* ¶¶ 103–08.

---

probability that he would know if and when the company's production declined. The employee furthermore provided specific information about the decline in production, including the number of "furnaces" Lihua used and had available and when the company "basically stopped production." *Id.* The article is thus sufficiently specific to support Plaintiffs' claim that Lihua's production declined in the first quarter of 2013.

### 6. Lihua's 2013 Third Quarter Form 10-Q

Lihua filed its 2013 Third Quarter Form 10-Q on November 12, 2013. CSAC ¶ 111. Plaintiffs' allegations regarding this filing again mirror their allegations related to the 2013 First and Second Quarter 10-Qs, and they adequately allege falsity for the same reasons. *See id.* ¶¶ 113–118.

### 7. Lihua's 2013 Form 10-K

Lihua filed its 2013 Form 10-K on March 17, 2014. CSAC ¶ 119. Plaintiffs' allegations as to the 2013 10-K also largely mirror their allegations regarding the 2013 First, Second, and Third Quarter 10-Qs, with two exceptions. *See id.* ¶¶ 121–126.

First, Plaintiffs allege that the 2013 10-K's statement that Lihua had no debt is also false in light of the 50 million RMB loan from Everbright. *Id.* ¶ 122. The Represented Defendants acknowledge that the Everbright loan is "inconsistent with the 10-K's statement that Lihua had 'no debt' at the end of 2013." Defs.' Mem. 17. The Everbright loan accordingly provides additional support to Plaintiffs' allegations that Lihua's 2013 10-K contains material misrepresentations.

Second, Plaintiffs do *not* allege that the 2013 10-K's Sarbanes-Oxley certification is false because of the Company's failure to disclose Wang and Lihua Copper's tax fraud. The CSAC instead alleges only that the certification "failed to disclose material weaknesses in internal controls that led to Defendants' failure to report that it owed 10 million RMB to China Construction Bank and 50 to Everbright in 2013." CSAC ¶ 126. For the reasons already explained, Plaintiffs do not sufficiently allege that Lihua's internal controls were inadequate, and they cannot pursue a securities fraud claim based on this theory.

**B.** **Scienter**

"Plaintiffs' claims under § 10(b) of the Exchange Act (and Rule 10b–5 promulgated thereunder) require a showing of scienter." *Tongue v. Sanofi*, ___ F.3d ____, 2016 WL 851797, at \*7 (2d Cir. Mar. 4, 2016). "The Supreme Court has defined scienter as 'a mental state embracing intent to deceive, manipulate, or defraud.'" *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 319 (2007)). "[T]he scienter requirement is met where the complaint alleges facts showing either: 1) a 'motive and opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99).

To allege sufficient facts under the "motive and opportunity" test, a plaintiff must show that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198. As a general rule, a defendant's motive is sufficiently alleged "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.*

When plaintiffs fail to allege motive, they may nonetheless allege scienter under the "strong circumstantial evidence" test, but "the strength of the circumstantial allegations must be correspondingly greater." *Id.* at 199 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). The circumstantial evidence that can support an inference of conscious misbehavior or recklessness includes situations in which defendants "(1) benefitted in a concrete and personal way

25

from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps. ' Ret. Sys.*, 794 F.3d at 306 (quoting *ECA*, 553 F.3d at 199). Under Second Circuit law, the recklessness required to plead scienter under this test "mean[s] 'conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'" *S. Cherry St.*, 573 F.3d at 109 (quoting *Novak*, 216 F.3d at 312).

The PSLRA requires that a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u–4(b)(2)(A).  In *Tellabs*, the Supreme Court concluded that "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." 550 U.S. at 323–24. "In other words, it is not enough 'to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent.'" *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (quoting *S. Cherry St.*, 573 F.3d at 110).  A plaintiff pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 550 U.S. at 324.

The Represented Defendants argue that Plaintiffs fail to plead scienter as to both Huang and Lihua. Defs.' Mem. 17–24.

### 1.  Huang

Plaintiffs fail to allege scienter as to Huang.  As a preliminary matter, Plaintiffs do not allege that Huang had sufficient motive to commit securities fraud. The CSAC's only allegations suggesting motive are that Zhu and Huang together violated § 10(b) and Rule 10b–5 "in an effort

to maintain artificially high market prices for Lihua's securities," or "to assure investors of Lihua's value and performance and continued substantial growth," or "for the purpose and effect of concealing Lihua's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities." CSAC ¶¶ 153, 155 & 157. These "motives," which are common to all corporate officers, are exactly the types of allegations the Second Circuit has repeatedly described as insufficient as a matter of law. *See ECA*, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."); *Novak*, 216 F.3d at 307 ("Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders, including: (1) the desire to maintain a high corporate credit rating, or otherwise sustain the appearance of corporate profitability, or of the success of an investment, and (2) the desire to maintain a high stock price in order to increase executive compensation, or prolong the benefits of holding corporate office." (internal quotations and citations omitted)); *Kalnit*, 264 F.3d at 139 ("Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation.").

Plaintiffs appear to acknowledge this failure, as they argue in their opposition memorandum only that various allegations of circumstantial evidence support an inference of scienter. *See* Pls.' Mem. 14–20. These allegations do not create a strong inference of scienter, however, nor do they establish an inference of scienter "at least as compelling as" the opposing inference that Zhu and Wang kept their activities hidden from Huang. *Tellabs*, 550 U.S. at 324.

Plaintiffs argue primarily that the allegedly false statements in Lihua's various SEC filings "were easily detectable from sources to which Huang had access." Pls.' Mem. 15. Plaintiffs cite

to (1) the "internal ledgers" that Plaintiffs allege Asia Pacific reviewed during its investigation into Lihua Copper's and Lihua Electron's finances, CSAC ¶ 59; (2) the Board resolutions of Lihua Copper and Lihua Electron approving the Everbight loan, *id.* ¶ 137; (3) Lihua's SAIC filings, which disclosed the China Construction Bank loans, *id.* ¶ 28; (4) "internal financial documents" that would have revealed Wang's tax fraud, Pls.' Mem. 19; and (5) Lihua's "bank statements," which would have revealed the Company's declining cash balances, *id.* at 19–20. The Represented Defendants argue that none of these materials "contradicted Lihua's disclosures" or were "available to Huang at the time" the disclosures were made. Defs.' Mem. 19.

The Court agrees with the Represented Defendants that Plaintiffs fail to allege that Huang had access to specific documents during the Class Period that would have revealed Zhu's and Wang's activities. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309. Plaintiffs' allegations do not meet this standard. As to the "internal ledgers" that Plaintiffs allege Asia Pacific reviewed, Lihua's September 29, 2014 Form 8-K states that in investigating Lihua Copper and Lihua Electron, Asia Pacific "verifi[ed] and investigat[ed] . . . material balance sheet items including inventory, accounts receivable, prepayment, other receivables, fixed assets, bank liabilities and other liabilities." Beneski Decl. Ex. 21, at 2. Plaintiffs incorporate this document into their pleading. *See* CSAC ¶ 59. Asia Pacific thus did more than review only "internal ledgers" to uncover Zhu's and Wang's fraud. Plaintiffs do not allege what specific documents Asia Pacific reviewed or that Huang had access to those documents. Nor do Plaintiffs allege that Huang had access to the Board resolutions or minutes of Lihua Copper and Lihua

Electron or Lihua's SAIC filings, or what specific "internal financial documents" or "bank statements" would have revealed Lihua's deteriorating financial condition.[9]

Plaintiffs' other allegations of circumstantial evidence of Huang's scienter also fail. Plaintiffs argue, for example, that Huang was aware that Lihua was run by a husband and wife team and that its operations were based in China, both of which create a heightened risk of fraud. *See* Pls.' Mem. 14. Plaintiffs neither allege nor argue, however, how those facts establish that Huang acted with "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St.*, 573 F.3d at 109 (quoting *Novak*, 216 F.3d at 312). Plaintiffs also argue that "Huang's role as CFO shows that she was aware of [Lihua's] debt level, or reckless for not learning of it." Pls.' Mem. 14. It is well-established, however, that "in order to establish an inference of scienter, Plaintiffs must do more than allege that . . . Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions." *PetroChina*, 120 F. Supp. 3d at 366 (citing cases).

Plaintiffs further contend that "the magnitude and long duration of the fraud" and "Huang's failure to take swift remedial action after Lihua's collapse" both support an inference of scienter. Pls.' Mem. 16–17. At most, however, these allegations support an inference that Huang "was 'merely negligent in the exercise of professional duties [she] owed to [Lihua].'" *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 434–35 (S.D.N.Y. 2014) (quoting *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 451–54 (S.D.N.Y. 2010)).

---

[9] Plaintiffs argue in a footnote that, as Lihua's CFO, Huang "would and should have reviewed the SAIC filings before their filing." Pls.' Mem. 16 n.11. The CSAC, however, does not allege facts to support this conclusion. It alleges only that "Huang was responsible for the day to day supervision of the finance department," which "handled the preparation and circulation of loan documents to banks." CSAC ¶ 25. The CSAC does not allege that Huang or the finance department oversaw Chinese regulatory filings. Plaintiffs' allegations thus differ from those at issue in *In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007), on which Plaintiffs rely. *See* Pls.' Mem. 16. In *Refco*, the plaintiffs specifically alleged that the CFO was "responsible for receiving and authorizing the payment of bills" that would have revealed fraudulent activity. 503 F. Supp. 2d at 652. The CSAC contains no similarly specific allegations that Huang was responsible for reviewing SAIC filings before they were completed.

In sum, none of Plaintiffs' arguments—even if the Court were to accept them—create an inference of Huang's scienter "at least as compelling as" the possibility that Zhu and Wang intentionally kept their fraudulent activity hidden from Huang and others at Lihua. *Tellabs*, 550 U.S. at 324. In such circumstances, Plaintiffs' § 10(b) claim against Huang must be dismissed.

### 2.   Lihua

To plead scienter as to a corporation "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 455 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "[T]he most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Id.*

The Represented Defendants do not contest that the CSAC adequately pleads scienter as to Zhu. They nonetheless contend, however, that Plaintiffs fail to plead scienter as to Lihua in light of the "adverse interest" exception, "which directs a court not to impute to a corporation the bad acts of its agent when the fraud was committed for personal benefit." *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 64 (2d Cir. 2013). "'[T]his most narrow of exceptions' is reserved for cases of 'outright theft or looting or embezzlement . . . where the fraud is committed *against* a corporation rather than on its behalf.'" *Id.* (quoting *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952 (N.Y. 2010)). According to the Represented Defendants, because "the facts indicate that [Zhu and Wang] looted" Lihua and in no way acted on the Company's behalf, Lihua's scienter does not attach to Zhu's. Defs.' Mem. 23–24. Plaintiffs argue that the adverse interest exception "should not apply where, as here, the victims are innocent third parties" and that, in any event, the Represented Defendants "ignore[] the fact that Plaintiffs are suing Lihua not for Zhu's unauthorized bank loans, but for the misstatements in securities filings." Pls.' Mem. 21. Plaintiffs

thus contend that Zhu's "decision to conceal his actions from shareholders was for the benefit of both himself and the company." Pls.' Mem. 21.

Two judges in this district have recently considered the scope of the adverse interest exception in securities fraud actions in which plaintiffs' claims are not based directly on a corporate officer's misconduct, but rather the corporation's failure to disclose that conduct in securities filings. *See PetroChina*, 120 F. Supp. 3d at 361–63; *Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013). In both cases, the courts held that the adverse interest exception does not apply. In *Wang*, Judge Engelmayer held that a CEO's "alleged failure to correct his and [the corporation's] public statements about an extant lock-up agreement did not operate as a fraud on the corporation; rather, as alleged, it defrauded the investing public." 989 F. Supp. 2d at 277. In other words, the failure to correct the corporation's public statements allowed the company "to survive—to attract investors and customers and raise funds for corporate purposes." *Id.* (quoting *Kirschner*, 938 N.E.2d at 953). In light of this benefit to the company, the CEO's interest in committing securities fraud was not adverse to the corporation's. In *PetroChina*, Judge Ramos reached the same result. In that case, the court concluded that "it was in [the corporation's] interest for any corruption occurring within the [c]ompany to remain undisclosed in order to preserve its shareholders' confidence." 120 F. Supp. 3d at 362. While distinguishing cases involving corporate officials who allegedly looted company assets, the court noted that "the pertinent acts here are the [defendants'] public statements on behalf of [the corporation], *not* the alleged underlying fraud." *Id.* at 363. In the context of Plaintiffs' § 10 (b) claim, both *Wang* and *PetroChina* thus stand for the proposition that when analyzing the adverse interest exception, the relevant inquiry is whether the corporation benefitted by making the allegedly material

misstatements or omissions, not necessarily whether the corporation benefitted from the underlying activity that made the statements false or misleading.

Viewed through that lens, the Court concludes that the adverse interest exception does not apply here. Plaintiffs allege that when GeoInvesting.com summarized the *People's Daily* article in English on April 30, 2014, Lihua's stock quickly "drop[ped] by more than 50% . . . before it was halted by NASDAQ." CSAC ¶ 131. Had Lihua's SEC filings disclosed Zhu's fraud earlier, the Company's value presumably would have declined at that point rather than on April 30, 2014. Suppressing the truth regarding Zhu's fraud was therefore in Lihua's interest, even if the fraud itself was not. Because Plaintiffs' § 10(b) claim relates not to Zhu's fraud but rather Lihua's purported failure to disclose it, the adverse interest exception does not apply. Accordingly, the CSAC adequately pleads Lihua's scienter.[10]

## II.   Section 20(a)

Section 20(a) of the Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

[10] A recent decision by the Ninth Circuit Court of Appeals provides additional support for concluding that the adverse interest exception does not shield Lihua from potential liability. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir. 2015). In *ChinaCast*, the court held that "having a clean hands plaintiff eliminates the adverse interest exception in fraud on the market suits because a bona fide plaintiff will always be an innocent third party." *Id.* at 479. The court determined that when a "faithless fraudster within the corporate ranks" speaks on behalf of the corporation, "the adverse interest rule collapses in the face of an innocent third party who relies on the agent's apparent authority." *Id.* at 476–77. The court imported this principle of agency law into securities fraud actions such that "when a corporate officer commits wrongdoing, the 'principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger.'" *Id.* at 477 (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494–95 (3d Cir. 2013)). No court in this circuit has had occasion to consider whether *ChinaCast* is consistent with Second Circuit law. In light of this Court's adoption of the reasoning of *Wang* and *PetroChina*, it need not be the first.

15 U.S.C. § 78t(a). There is a "widely acknowledged split" among judges in this district as to whether a § 20(a) claim contains two or three elements. *In re ShengdaTech, Inc. Sec. Litig.*, No. 11-CV-1918 (LGS), 2014 WL 3928606, at \*10 n.1 (S.D.N.Y. Aug. 12, 2014). "In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *Sec. & Exec. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal quotations and citations omitted). All judges agree that, to bring a § 20(a) claim, a plaintiff at a minimum must allege (1) a primary violation by the controlled person and (2) control of the primary violator by the targeted defendant. Judges in this district disagree, however, as to "whether the culpable participation element is a scienter requirement that must be affirmatively pleaded at the motion to dismiss stage." *ShengdaTech*, 2014 WL 3928606, at \*10 n.1. The Second Circuit has recognized this disagreement, but thus far has not resolved it. *See In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011).

Without reiterating the arguments already analyzed by other judges, this Court agrees with the majority of judges in this district that plaintiffs must plead culpable participation in order to state a claim under § 20(a). *Compare, e.g., Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 244–49 (S.D.N.Y. 2006) (agreeing "with the line of cases that applies Second Circuit precedent to hold that 'culpable participation' is a pleading requirement to state a section 20(a) claim, and that it must be plead [*sic*] with the same particularity as scienter under section 10(b)"), *with, e.g., In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307–10 (S.D.N.Y. 2005) (interpreting the language of § 20(a) to require "that the defendant bears the burden of establishing good faith

33

and lack of inducement, not that the plaintiff must allege the opposite in its pleadings"); *see also ShengdaTech*, 2014 WL 3928606, at *10 & n.1 (collecting cases on both sides of the disagreement). *First Jersey* indicates that a *plaintiff* must "show that the controlling person was 'in some meaningful sense a culpable participant.'" 101 F.3d at 1472 (quoting *Gordon v. Burr*, 506 F.2d 1080, 1085 (2d Cir. 1974)). As other judges have concluded, "the most natural reading" of this language requires plaintiffs to plead culpable participation with the same particularity they must plead scienter under the PSLRA. *ShengdaTech*, 2014 WL 3928606, at *10 & n.1.

Plaintiffs here fail to do so. Plaintiffs do not plead Huang's culpable participation for the same reasons they do not plead her scienter. *See id.* at *11 ("Because the [c]omplaint fails to plead even recklessness with the particularity required by the PSLRA . . . in the § 10(b) context, it also necessarily fails to do the same in the § 20(a) context."). Nor do Plaintiffs allege any particularized facts establishing that Bruce, Serbin, and Lao were reckless because they did not uncover Zhu's and Wang's fraud. Plaintiffs argue that they allege culpable participation because Lihua's Audit Committee (of which Bruce, Serbin, and Lao were the only members) was "paying close attention, beyond what is normally required of [A]udit [C]ommittee members, to the company's financial situation." Pls.' Mem. 24. To support this argument, however, Plaintiffs cite Huang's May 10, 2013 conference call, during which she said that the Audit Committee "has proactively conducted cash diligence back in 2011." CSAC ¶ 99. That the Audit Committee reviewed Lihua's finances *before* the Class Period does not establish that the Audit Committee performed the same work *during* the period in which Plaintiffs allege the securities fraud occurred. As with Huang, Plaintiffs ultimately do not meet their burden to allege particularized facts regarding Bruce, Serbin, and Lao that rise above possible negligence. The CSAC's § 20(a) claim therefore must be dismissed.

## CONCLUSION

The Represented Defendants' motion to dismiss is granted with respect to Daphne Yan Huang, Robert C. Bruce, Jonathan P. Serbin, and Kelvin Lau and denied with respect to Lihua International, Inc.  The Clerk of Court is respectfully directed to terminate item number 80 on the docket and dismiss Defendants Huang, Bruce, Serbin, and Lau from this action.  Counsel for the remaining parties shall appear for a conference on April 22, 2016 at 2:00 p.m.  No later than one week before the conference, the parties shall jointly submit a proposed case management plan and scheduling order.  A template for the order is available at http://nysd.uscourts.gov/judge/Abrams.

SO ORDERED.

Dated:   March 31, 2016
         New York, New York

_____
Ronnie Abrams
United States District Judge